

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Charleston Division

RAKESH WAHI, M.D.,

        Plaintiff,

v.                             CIVIL ACTION NO. 2:04-0019

CHARLESTON AREA MEDICAL CENTER,
a West Virginia corporation, and JANE DOES I-X,

        Defendants.



Unsealed 07-28-04

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
### ITS MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

COMES NOW the defendant, Charleston Area-Medical Center, Inc. ("CAMC"), by

counsel, and submits this memorandum of law in support of its *Motion to Dismiss or for Summary

Judgment*:

### I. PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY
### PURSUANT TO THE PRIMARY JURISDICTION DOCTRINE
### BECAUSE HE HAS NOT COMPLETED THE PEER REVIEW
### PROCEEDINGS UPON WHICH HIS SUIT IS BASED

#### A. INTRODUCTION

The issues now before this Court arise out of ongoing peer review proceedings at CAMC

relating to the quality of medical care provided to its patients by the plaintiff, Rakesh Wahi, M.D.

("Dr. Wahi"). Dr. Wahi's Complaint asserts causes of action against CAMC for discrimination

(pursuant to 42 U.S.C. §1981), defamation, breach of contract, breach of implied covenant of good

faith and fair dealing, and denial of "due process" and retaliatory conduct in violation of the United

States Constitution. All of Dr. Wahi's claims relate to CAMC's handling of peer review

investigations concerning his medical competence, actions taken by CAMC with respect to his

*8*

Medical Staff privileges based upon the findings and recommendations of his peers, and the resulting reports filed by CAMC with the National Practitioner Data Bank ("NPDB").

Dr. Wahi has failed to exhaust the administrative remedies available to him under CAMC's Medical Staff Bylaws, Medical Staff Procedures Manual, and Medical Staff Rules and Regulations (hereinafter sometimes refered to collectively as CAMC's "Medical Staff governing documents"). Specifically, Dr. Wahi has failed to proceed with his right to a peer review appeal hearing wherein he would be entitled to challenge the correctness of the actions taken against his Medical Staff privileges by the hospital and the accuracy and validity of the NPDB reports about which he complains. CAMC respectfully asserts, therefore, that this Court should apply the doctrine of "primary jurisdiction" to dismiss this action until Dr. Wahi has exhausted his administrative remedies by completing the peer review process. Such a dismissal would further the goals of federal law, state law, and sound public policy, all of which recognize that the medical profession should police its own members through the peer review process, and seek to encourage the free flow of candid information within that process by respecting its autonomy and affording it a shield of confidentiality. Denial of this motion would, on the other hand, frustrate the hospital's ability to effectively govern its Medical Staff to safeguard and promote the quality of patient care, and would have a "chilling effect" on the process of peer review conducted by health care institutions in this State, undermining that process to the detriment of the public health.

## B. STATEMENT OF FACTS

1.  On December 16, 1992, Dr. Wahi was appointed to the Medical Staff of CAMC, Associate (Provisional) Staff Category, with assignment to the Department of Cardiovascular Medicine, Section of Thoracic Surgery[1].

---

[1]As a cardiothoracic surgeon, Dr. Wahi was initially granted privileges to perform complex surgical procedures involving major blood vessels, the lungs, and the heart (including coronary artery bypass grafting, commonly referred to as "open heart" or "heart

2. Dr. Wahi's Medical Staff privileges at CAMC were summarily suspended in July of 1999.

3. While Dr. Wahi held privileges at CAMC, the hospital received numerous verbal complaints, written complaints, incident reports, and statements of concern (hereafter sometimes referred to collectively as "statements of concern") alleging unprofessional and unethical conduct by Dr. Wahi and calling into question his medical and surgical competence, professional judgment, and ability to practice cooperatively with the other healthcare professionals. These statements of concern arose out of dozens of separate incidents, and originated from multiple healthcare professionals in various departments of the hospital, as well as from the family members of his patients. Several statements of concern alleged that Dr. Wahi was guilty of inhumane treatment of his patients.

4. As it was obligated to do, CAMC investigated the statements of concern it received regarding Dr. Wahi. The evidence gathered through these investigations was submitted for evaluation to multiple peer review committees and organizations, including an independent, external peer review body. Consistent with the findings and recommendations of these bodies, CAMC acted to protect the quality of care afforded to its patients by prompting Dr. Wahi to undergo voluntary remedial training and to complete two courses in Medical Ethics. In addition, CAMC, at times, placed certain measured restrictions on Dr. Wahi's Medical Staff privileges -- including the requirement that he operate under the "line of sight" supervision of other cardiothoracic surgeons -- in order to ensure high quality patient care.[2]

---

bypass" surgery).

[2] CAMC's administration worked *exhaustively* to define, communicate, and enforce appropriate restrictions on Dr. Wahi's Medical Staff privileges. These efforts were undertaken with the hope that the application of appropriate restrictions would allow him to practice medicine in this community in a manner which promotes the paramount goal of providing quality health care.

5.      Where required to do so by federal law, CAMC has reported to the NPDB adverse actions taken against Dr. Wahi's Medical Staff privileges as a result of the peer review process.

6.      Dr. Wahi's continued inability or unwillingness to accept the criticism and counsel of his peers and conform his practice to acceptable professional standards ultimately forced the Credentials Committee to recommend on July 6, 1999, that the Board of Trustees deny his request for reappointment to the Medical Staff.  Shortly thereafter, on July 30, 1999, CAMC summarily suspend all of his Medical Staff privileges in the best interest of patient care.

7.      Under CAMC's Medical Staff Procedures Manual, Dr. Wahi is afforded the right to appeal the denial of his Application for Medical Staff Reappointment, and his subsequent summary suspension, by requesting a hearing pursuant to Article III, Section 3.3 of the Manual. On September 8, 1999, Dr. Wahi, by counsel, exercised that right and requested a hearing under

---

As the result of the findings of a Peer review investigation undertaken in 1995 to look at these quality of practice issues, the Chief of Staff recommended to the hospital Board of Trustees that it deny Dr. Wahi's reappointment to the Medical Staff, but allow him to apply for privileges as a clinical MD assistant to function as a first assistant only, with restrictions including line of sight supervision by a physician with clinical privileges. Dr. Wahi accepted this proposed course of action and withdrew his application for reappointment to the Medical Staff on January 30, 1996.

On February 8, 1996, Dr. Wahi was granted privileges as an Allied Health Professional as a Clinical MD Assistant. On February 28, 1997, Dr. Wahi was again appointed to the Medical Staff, Associate (Provisional) category with the provision that he obtain a proctor for specific procedures. On July 16, 1998, his clinical privileges were suspended again for violation of proctoring requirements. These privileges were restored on August 13, 1998, provided that he have a first assistant or co-surgeon for specific surgical procedures.

On October 7, 1998, the proctor requirement was lifted, but Dr. Wahi was required to obtain a concurrent second opinion for the surgeries he recommended to patients and was not permitted to perform investigational or minimally invasive coronary procedures or any high-risk procedures for which a projected mortality rate was 7% of higher. Dr. Wahi's privileges were again suspended for three days in April of 1999 for non-compliance of these restrictions.

Section 3.3. However, he has never been willing to proceed with the hearing according to the

hospital's Medical Staff governing documents.[3]

8.      On November 27, 2000, Dr. Wahi filed a Complaint in the Circuit Court of

Kanawha County requesting court intervention of the ongoing peer review proceedings relating

to the suspension of his Medical Staff privileges. Shortly thereafter, on January 17, 2001, Dr.

Wahi filed motions for extraordinary relief in the Kanawha County action requesting that the

Circuit Court:(1) assert jurisdiction over and alter the rules governing the ongoing peer review

proceedings, (2) immediately reinstate his full Medical Staff privileges, (3) invalidate past

unspecified "actions taken" by CAMC with respect to his Medical Staff privileges, and (4) order

---

[3] Attempting to get Dr. Wahi to actually participate in the peer review appeal hearing has been a tedious and frustrating process. On December 2, 1999, CAMC, through its President and CEO, Phillip H. Goodwin, acknowledged Dr. Wahi's request for a hearing, indicated that the hearing would begin at a date and time to be agreed upon by "all involved in the process", and identified the physicians who would serve as members of the hearing panel. Dr. Wahi promptly raised objections to the composition of the hearing panel. On December 21, 1999, CAMC directed a letter to Dr. Wahi's counsel requesting additional information regarding his opposition to the composition of the Hearing Panel and requesting "a series of convenient dates" for the scheduling of the hearing. Dr. Wahi failed to provide any available dates for the hearing as requested.

On September 22, 2000, Dr. Wahi's counsel wrote CAMC seeking an agreement to (1) limit the "relevant time period" to be considered at the administrative hearing" and "the issues upon which evidence is to be presented", (2) to disqualify and replace the hearing examiner appointed by CAMC, and (3) to dissolve the hearing panel appointed by CAMC and allow Dr. Wahi to participate in the selection of an alternative hearing panel.

On October 11, 2000, CAMC informed Dr. Wahi that the subject matter of the hearing would not be arbitrarily limited to the time frame he proposed as the "ultimate recommendation of the Credentials Committee to deny Dr. Wahi's reappointment was based upon an accumulation of concerns that spanned a number of years", and informed Dr. Wahi that it would not alter the procedures for selection of the hearing panel as set forth in the Medical Staff governing documents.

On October 31, 2000, CAMC directed a letter to Dr. Wahi's counsel explaining that Dr. Wahi's various proposals to alter the peer review appeal hearing process were contrary to the Medical Staff governing documents, but indicating that it would take under advisement the question of who would serve as hearing examiner and whether the composition of the hearing panel should be altered. This letter also indicated that the President of CAMC would soon schedule the hearing and requested that Dr. Wahi let it know if any of the dates to be provided were inconvenient. Dr. Wahi then filed suit in the Circuit Court of Kanawha County asking that the court preside over the appeal hearing.

CAMC to withdraw reports adverse to him previously submitted to the National Practitioner Data Bank and the West Virginia Board of Medicine.

9.　In the <u>Conclusions of Law</u> portion of its *Memorandum Opinion and Order* dismissing Dr. Wahi's claims, the Circuit Court of Kanawha County found that CAMC was not a "state actor" so as to invoke federal and state constitutional due process requirements when it decides to revoke Medical Staff appointment privileges. The Court also found that a decision of a private hospital to revoke, suspend, restrict or to refuse to renew the staff appointment or clinical privileges of a Medical Staff member is subject to limited judicial *review* to insure that there was a substantial compliance with the hospital's Medical Staff Bylaws and to insure that the Medical Staff Bylaws afford basic notice and fair hearing procedures, including an impartial tribunal.

10.　Noting the judicial reluctance to review the Medical Staffing decisions of private hospitals and the general unwillingness of the courts to substitute their judgment on the merits for the professional judgment of physicians and hospital officials conducting peer review, the Circuit Court of Kanawha County applied the doctrine of primary jurisdiction and dismissed Dr. Wahi's suit from the docket. (See, *Memorandum Opinion and Order* entered by the Honorable Charles E. King, Jr., Circuit Judge, 13th Judicial Circuit, on December 6, 2001, attached hereto as Exhibit "A").[4]

---

　　[4]　The Kanawha County Circuit Court found that Section 3.8 of Article III of CAMC's Medical Staff Procedures Manual complied with the provisions of HCQIA for selection of a peer review hearing panel and, therefore, constituted a fair panel selection procedure in the eyes of federal law, violated no state laws, and, on its face, satisfied the basic fair hearing requirements articulated in *Mahmoodian v. United Hospital Center*, 185 W.Va. 59, 404 S.E.2d 750 (1991).

The Court further held that:

　　"Federal law, state law, and public policy all demand that hospital peer review procedures not be subject to challenge and review in Circuit Court while the peer review proceedings are still underway where: (1) the procedures

11.    Dr. Wahi petitioned the Supreme Court of Appeals of West Virginia to accept an appeal from the Circuit Court of Kanawha County's Order. That Petition was denied on July 15, 2002. (See, Exhibit "B" attached hereto).

12.    CAMC continues to stand ready to provide to Dr. Wahi with a peer review appeal hearing as provided for under the Medical Staff governing documents, and will schedule the hearing to take place at a time agreeable to all necessary participants to the process. Unfortunately, Dr. Wahi continues to avoid the appeal hearing available to him, preferring instead to seek relief for his professional problems in civil court.

## C. DISCUSSION

### (i) Overview of Contentions

Dr. Wahi is attempting to obtain relief in United States District Court for peer review actions undertaken against him at CAMC without first completing that administrative process. Much as he attempted to do in the Circuit Court of Kanawha County, Dr. Wahi is attempting with the filing of this action to avoid a final *administrative* resolution to his peer review problems at CAMC by first seeking a *judicial* resolution. This is clear from the Prayer For Relief set forth in the Complaint, wherein he prays, in part, that this Court: (1) "Find and declare that the reports made by the corporate defendant to the NPDB are invalid and contrary to law" and (2) "Direct the Corporate Defendant to remove its derogatory reports concerning Dr. Wahi from the NPDB." National health care policy, federal and state law, important public policy considerations, and the judicial principle of "ripeness," all dictate that this Court should apply the doctrine of *primary*

---

complained of comport with federal and state law, (2) the physician being evaluated has previously agreed to be bound by the procedures, and (3) the arguments by the physician that he will be denied a fair hearing are speculative."

*Jurisdiction* and dismiss this civil action until Dr. Wahi's peer review proceedings at CAMC have reached a final resolution.

Like all hospitals, CAMC has a duty to monitor the quality of care rendered by the members of its Medical Staff, and to act *prospectively* in an effort to protect the public from substandard care whenever and wherever possible. Perhaps the most powerful tool available to the hospital to accomplish this goal is its ability to restrict or suspend the privileges of its Medical Staff. Having received many statements of concern regarding Dr. Wahi, CAMC had a duty to thoroughly investigate those reports, submit the information gathered to peer review committees, and then seriously consider and act upon the findings and recommendations of those committees by implementing whatever restrictions of his Medical Staff privileges it believed necessary to protect the public. Pursuant to federal law, CAMC was also required to make reports concerning the peer review actions taken against Dr. Wahi to the NPDB.[5]  To allow Dr. Wahi to challenge in civil court the findings of his peers concerning his medical competence, and the accuracy and validity of the reports submitted to the NPDB as a result of those findings, before requiring him to complete the peer review process would cripple the hospital's ability to conduct meaningful peer review and effectively self-govern the privileges of its Medical Staff.

The peer review procedures at CAMC constitute the standard means by which hospital's scrutinize the quality of care rendered by staff physicians, and are being carried out in accordance with the procedural guidelines for peer review established by the United States Congress when it enacted the Health Care Quality Improvement Act of 1986 ("HCQIA"). Sound public policy mandates that these peer review proceedings be allowed to conclude unfettered and untainted by a corresponding civil lawsuit – which, if permitted to proceed, will have a "chilling effect" upon

---

[5]  These reports are subject to revision, supplementation, or substitution should Dr. Wahi proceed with his Section 3.3 appeal hearing and prevail.

the participants to the process. In addition, many of the issues raised by Dr. Wahi's Complaint are not yet ripe for judicial consideration. Accordingly, this Court should apply the doctrine of primary jurisdiction and dismiss this action until the conclusion of his peer review proceedings.

### (ii) Applicable Law

Court, commentators, and counsel have often confused the closely related judicial doctrines of "exhaustion" and "primary jurisdiction." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-64, 77 S.Ct. 161, 164-65, 1 L.Ed.2d 126, 132 (1956); *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2nd Cir. 1992). Both doctrines are judicially created, self-imposed limits to court jurisdiction, requiring a plaintiff to exhaust available administrative remedies before seeking court-sponsored relief. The doctrines provide "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." See, for example, *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct., 1657, 1662, 23 L.Ed.2d 194, 203 (1969). Both doctrines are flexible and should be applied according to the discretion of the courts depending upon the circumstances. See *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 866 (5th Cir. 1975). Addressing the doctrine of exhaustion, the United States Supreme Court has explained:

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Bowen v. City of New York*, 476 U.S. 467, 484, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462, 477 (1986). The principles underpinning the primary jurisdiction doctrine are much the same, as are the circumstances under which it is applied. The distinctions between the doctrines are subtle. Exhaustion applies "where a claim is cognizable in the first instance by an administrative agency

alone." *Western Pac. R.R.*, 352 U.S. at 63, 77 S.Ct. at 165, 1 L.Ed.2d at 132. In other words, the exhaustion doctrine applies where the administrative body in question has <u>exclusive</u> jurisdiction of ongoing administrative process. The primary jurisdiction doctrine, on the other hand, applies where "the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body . . . ." <u>Id</u>. at 64, 77 S.Ct. at 165, 1 L.Ed.2d at 132. In short, the primary jurisdiction doctrine applies where the administrative body's jurisdiction, although not exclusive, is <u>primary</u>, and should be given judicial *deference*. In such cases, the courts should suspend their own jurisdiction pending completion of the administrative proceedings. <u>Id</u>.

Both federal and state courts have applied the doctrines of exhaustion and primary jurisdiction, alternatively, to dismiss or stay suits brought by physicians engaged in professional peer review proceedings. See *Johnson v. Nyack Hospital*, supra; *Rogers v. Columbia/HCA*, 961 F.Supp 960 (W.D. La. 1997); *Bigman v. Medical Liability Mut. Ins. Co.*, 1996 WL 79330 (S.D. N.Y. 1996); *Huntsville Memorial Hosp. v. Ernst*, 763 S.W.2d 856 (Tex. Ct. App. 14th Dist. 1988); *Eidelson v. Archer*, 645 P.2d 171 (Alaska 1982); *Garrow v. Elizabeth General Hosp. and Dispensary*, 79 N.J. 549, 401 A.2d 533 (1979). In *Johnson v. Nyack Hospital*, a physician whose hospital surgery privileges were suspended sued the hospital and peer review board members. The District Court, relying on the doctrine of administrative exhaustion, dismissed the Complaint, finding that the physician was obligated to exhaust his administrative remedies. The Second Circuit upheld the judgment on appeal, but held that dismissal was justified by the doctrine of primary jurisdiction, not exhaustion. <u>Id</u>. at pp. 120-122.

The Louisiana District Court, in the *Rogers v. Columbia/HCA*, reached an identical holding concerning a physician's complaint arising out of ongoing peer review proceedings. It did so even though the physician's complaint included federal antitrust claims over which the

Court had exclusive jurisdiction.[6] Because of this exclusive jurisdiction, the *exhaustion* doctrine could not be applied. However, the Court applied the *primary jurisdiction* doctrine, staying all of the physician's claims until he had exhausted his administrative remedies.[7] The Court found that hospital peer review bodies are administrative bodies that carry out an essential function within the well developed regulatory scheme created by the federal Health Care Quality Improvement Act and similar Louisiana statutes encouraging effective medical peer review. The analysis and legal reasoning in *Rogers* are directly on point with the issues now before this Court:

> Our holding that we must wait for plaintiff to exhaust his administrative procedures is consistent with the rationale behind the primary jurisdiction doctrine. First, by granting professional peer review committees qualified immunity, both Congress and the Louisiana legislature vested peer review committees the authority to make factual findings. Second, the expertise of professional peer review committees makes them specially qualified to make findings as to the competence of fellow physicians. We find that the evaluation of professional proficiency of physicians is best left to their peers, subject only to limited judicial surveillance. See *Sosa v. Bd. of Managers of Val Verde Memorial Hosp*, 437 F.2d 173, 177 (5th Cir. 1971). Third, we believe that judicial economy will be best served by requiring plaintiff to exhaust his administrative remedies. Perhaps a solution may be reached without further judicial intervention. Id. at p. 967.

The *Rogers* opinion is entirely consistent with West Virginia law, which like the law of the Fifth Circuit grants the courts wide discretion to apply the primary jurisdiction doctrine whenever it is appropriate to afford judicial deference to the functions of an administrative body.

---

[6]Federal courts have exclusive jurisdiction over federal antitrust lawsuits. See e.g., *Derish v. San Mateo-Burlingame Bd. of Realtors*, 724 F.2d 1347, 1349 (9th Cir. 1983).

[7]Under Fifth Circuit law, the primary jurisdiction doctrine applies "whenever enforcement of the claim requires the resolution of issues which under a regulatory scheme, have been placed within the special competence of an administrative body . . . ." Western Pac. R.R. 352 U.S. at 64, 77 S.Ct. at 165, 1 L.Ed.2d at 132; Northwinds Abatement, Inc. v. Employers Ins. of Wausau, 69 F.3d 1304, 1309 (5th Cir. 1995). Application of the doctrine is on a case-by-case basis, with an emphasis on "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." Western Pac. R.R., 352 U.S. at 64, 77 S.Ct. at 165, 1 L.Ed.2d at 132.

In *State ex rel. Bell Atlantic-West Virginia, Inc. v. Ranson,* for example, the West Virginia Supreme Court (quoting from the Fifth Circuit case of *Penny v. Southwestern Bell Telephone,* 906 F.2d 183, 187 (5th Cir. 1990)), stated: "[T]here is no 'fixed formula' to determine whether the primary jurisdiction doctrine should be applied, 'each case must be examined individually to determine whether it would be aided by the doctrine's application.'" Thus, "a court's decision to submit or not to submit an issue for initial determination by an administrative agency is reviewed on appeal under an abuse of discretion standard." 497 S.E.2d 755, 201 W.Va. 402 (1997) at 764. The *Bell Atlantic-West Virginia* Court concluded by holding that where a court and an administrative body have concurrent jurisdiction "of an issue which requires the agency's special expertise and which extends beyond the conventional experience of judges, the doctrine of primary jurisdiction applies."[8]

### (iii) Argument

The doctrine of primary jurisdiction should be applied in the present case to bar Dr. Wahi's civil claims until his peer review proceedings at CAMC are concluded because these proceedings are an essential administrative function delegated to the hospital as part of the well developed regulatory scheme established by the United States Congress when it enacted HCQIA. The statutory and common law of West Virginia should also persuade this Court to show deference to these proceedings, as should the principles of equity and important considerations of public policy. Finally, the primary jurisdiction doctrine should be applied because the relief sought by Dr. Wahi is not ripe for consideration and cannot be maturely considered until his peer review proceedings have concluded.

---

[8] The Court noted previously in the opinion that "The primary jurisdiction doctrine is not technically a question of jurisdiction, but rather a matter of judicial self-restraint[.]" *Public Administrative Law and Procedure* §37 at 437 (footnotes omitted).

**Application of the Primary Jurisdiction Doctrine to Dismiss
This Suit Until Dr. Wahi Has Completed His Ongoing Peer Review
Proceedings is Appropriate Because it Gives Appropriate Judicial
Deference to the Proceedings of an Administrative Body That
Carries Out an Essential Function Within the Well Developed
Regulatory Scheme Created by HCQIA**

For decades, the peer review process has been the primary means used by hospitals to monitor and improve the qualify of the medical care it delivers. While these efforts were initially undertaken by the medical profession on a voluntary basis, a host of regulations and legal obligations now compel hospitals to monitor the quality of health care provided by its medical staff through organized peer review.[9] In 1986, Congress enacted the *Health Care Quality Improvement Act* with the stated goal of further strengthening and promoting effective peer review in this country.[10] To accomplish this goal, the Act establishes standardized procedures for hospital peer review and affords immunities to hospitals and physicians who participate in the process using the procedural guidelines outlined in the Act, or other procedures fair to the

---

[9] See, Johnson v. Misericordia Community Hospital, 301 N.W.2d 156 (Wis.1981). In addition, the courts have specifically held that hospital's have a duty to take necessary corrective action when the peer review process has determined that a physician is providing substandard care. See West Covina Hospital v. Superior Court of Los Angeles County, 718 P.2d 119 (Cal 1986). The federal government also requires hospitals to establish an effective quality assurance program in order to receive reimbursement from Medicare. 42 C.F.R. §482.21 (1991).

[10] See, 132 CONG. REC. H9957 (daily ed. Oct. 14, 1986) (statement of Rep. Waxman). Congress recognized that there are many good reasons for physicians to be reluctant to actively participate in the process. A hospital can require that physicians participate in medical peer review as a condition of hospital privileges. However, it has little control over whether physicians conduct effective peer review. The stakes in a peer review process are often very high. The consequences of an adverse finding to the subject of the process may have devastating personal and financial impact. Naturally, this makes it difficult for the reviewing physicians to act decisively to censor another colleague. In addition, physicians participating in the peer review process have been named in defamation actions, illegal discrimination actions, and anti-trust claims. See Jaffe, *The Healthcare Quality Improvement Act: Anti-trust Liability and Peer Review*, 24 Tort & Ins. A.J. 571, 572 (1989).

physician being evaluated.[11]  Since the enactment of HCQIA, the peer review procedures contained in the Act have become the national standard for hospitals conducting peer review.[12]

Congress also included within HCQIA provisions specifically designed to prevent incompetent physicians from moving to different hospitals or states to escape detection once adverse peer review proceedings have been instituted or completed.  To accomplish this goal, HCQIA establishes a national reporting system for all peer review determinations that adversely affect a physician's privileges for longer than thirty (30) days and for all settlements of medical malpractice claims.  42 U.S.C.A. §11131-34.  This national reporting system was implemented in 1990 with the promulgation of regulations by the Department of Health and Human Services, establishing the National Practitioner Data Bank. 55 Fed. Reg. 31, 239 (1990) (codified at 45 C.F.R. §60 (1991)).

---

[11] Published Law No. 99-660 title IV, §402, 100 Stat. 3784 (current version at 42 U.S.C.A. §§11101-11152 (W pamphlet 1991).  See specifically, 42 U.S.C.A. §§1111-12.

[12] For a hospital conducting medical peer review to qualify for immunity, the medical peer review action must be taken (a) "in the reasonable belief that the action was in the furtherance of quality health care",(2) after "a reasonable effort to obtain the facts of the matter.", (3) after *"adequate notice and hearing procedures"* are afforded to the involved physician *"or after such other procedures as are fair to the physician under the circumstances."*, and (4) "in the reasonable belief that the action was warranted by the facts known . . . ." See §11112.

HCQIA also clearly defines what constitutes adequate "notice and hearing." Adequate "notice" requires a description of the proposed action, the reasons for the proposed action, and disclosure of the hearing rights to which the physician is entitled. §11112(b)(1). The "hearing" to which the physician is entitled is "trial-type" in nature.  The physician has a right to represented by an attorney, and to have a record made of the hearing. §11112(b)(3)(C)(ii).  The physician may call witnesses and cross-examine the witnesses of the hospital, and is granted the opportunity to present evidence and to "submit a written statement at the end of the hearing." §11112(b)(3)(C)(iv)-(v).  The Act specifies that the hearing should be held either (1) before an arbitrator "mutually acceptable to the physician and the health care entity", (2) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician", or (3) "before a panel of individuals who are appointed by the entity and are not an direct economic competition with the physician involved . . . ." §11112(b)(3)(A)(i)-(ii).

Congress, through enactment of the HCQIA, established a national "regulatory scheme" committing the evaluation of physicians and other health care providers to internal hospital administrative peer review bodies. The obvious legislative purpose behind this comprehensive statutory scheme is to encourage the medical profession to police its own activities *with minimal judicial involvement*. HCQIA was created to give hospitals *greater authority and autonomy* to identify and restrict the practice of substandard physicians, or physicians engaging in unprofessional behavior. *Wayne v. Genesis Medical Center*, 140 F.3d 1145(8th Cir. 1998); *Swatch v. Treat*, 41 Mass App. Ct. 559, 671 N.E.2d 1004 (1996). The clear intent of these provisions is to prevent troubled physicians from simply relocating their practice with a "clean bill of health" once adverse peer review actions have been taken against them.

### Application of the Primary Jurisdiction Doctrine to Dismiss This Suit Until Dr. Wahi Has Completed His Ongoing Peer Review Proceedings is Appropriate Because Such Dismissal Will Give Those Proceedings the Deference to Which They Are Entitled Under the Statutory and Common Law of West Virginia

The statutory and common law of West Virginia also support the application of the primary jurisdiction doctrine to dismiss this action. In 1980, the West Virginia Legislature created a qualified immunity for persons providing information to peer review organizations and a privilege for the records of medical peer review organizations by enacting the Health Care Peer Review Organization Protection Act (hereinafter referred to as the "West Virginia Peer Review Statute"). W.Va. Code §30-3C-1 *et seq.* Since that time, a substantial body of state common law regarding the activities of peer review organizations has developed. See *Mahmoodian v. United Hospital Center, Inc.*, 404 S.E.2d 750, 185 W.Va. 59 (1991); *Shroades v. Henry*, 187 W.Va. 723 (1992); *Young v. Saldanah*, 189 W.Va. 330, 431 S.E.2d 669 (1993).

The *Shroades* Court noted that the West Virginia Peer Review Statute was enacted with the ultimate purpose of improving the quality of medical care provided in the hospitals of this

State. See also *Daily Gazette Company, Inc. v. West Virginia Board of Medicine*, 177 W.Va. 316,

352 S.E.2d 66 (1986). In *Young v. Saldanah*, the West Virginia Supreme Court reiterated that the

enactment of W.Va. Code §30-3C-1 *et seq*. clearly evidences a public policy encouraging health

care professionals to monitor the competency and professional conduct of their peers in order to

safeguard and improve the quality of patient care. In the body of the *Saldanah* opinion, the

Supreme Court cited to the case of *Jenkins v. Wu*, 102 II. 2d 468 N.E. 2d 1162 (1984), in which

the Supreme Court of Illinois explained the purpose of peer review legislation:

> "[I]ts purpose is to ensure the effectiveness of professional self-
> evaluation by members of the medical profession, in the interest of
> improving the quality of health care. The Act is premised upon the
> belief that, absent the statutory peer review privilege, physicians
> would be reluctant to sit on peer review committees and engage in
> frank evaluations of their colleagues."

177 W.Va. at 322 (quoting *Jenkins v. Wu* at 1168-69).[13] The *Saldanah* Court also cited favorably

to an Order entered by a state Circuit Court denying the release of documents protected as peer

review, quoting directly therefrom as follows:

> "The Court notes in making these rulings that there are substantial
> policy consideration in favor of the protection of records and
> proceedings of peer review organizations. The Court also finds
> that it is in the interest of public policy to allow the medical
> profession to police the activities of its own members through the
> peer review process and that the protection of the documents and
> information generated through that process promotes the free
> exchange of information so that the highest quality of medical care
> reasonably obtainable can be made available to the community.
> The statute in question, W.Va. Code §23-3C-1 et seq., seeks to
> encourage the free flow of information through the peer review
> process by preserving the confidentiality of the information and to
> some extent in anonymity of individuals involved in the peer
> review process. To narrowly construe the statue in the manner
> requested by the plaintiff herein would frustrate and defeat the

---

[13] All fifty states plus the District of Columbia have codified the peer review privilege
which was generally recognized at common law. This privilege generally protects all peer
review records from disclosure in non-peer review settings. See Footnote 7 in Saldanah,
supra.

purpose of the statute and, in the opinion of this Court, would have a chilling effect on the process of peer review in institutions throughout the state of West Virginia which would be a detriment ultimately to the health care of the citizens of the state."

The *Saldanah* Court goes on to recognize:

"The enactment of the peer review statute represents a legislative realization that self-policing within the medical community is vital ...both commentators and the courts alike agree that without self-evaluation which the peer review privilege both protects and encourages, complaints involving medical care and treatment could not be fully investigated in the preferred manner of voluntary and forth right participation due to the lurking fears of reprisals and repercussions." Id at pg. 10.

Clearly, it is a well settled principle of West Virginia law that the courts should afford considerable deference to hospital peer review activities. The West Virginia Supreme Court articulated this point succinctly in Syllabus Pt. 1 of *Mahmoodian*:

[T]he decision of a private hospital to revoke, suspend, restrict or to refuse to renew the staff appointment or clinical privileges of a medical staff member is subject to *limited* judicial *review* to ensure that there *was* substantial compliance with the hospital bylaws governing such a decision, as well as to ensure that the medical staff bylaws afford basic notice and fair hearing procedures, including an impartial tribunal." (Emphasis added).

The Mahmoodian Court also concisely explained the reasoning behind this self-imposed court deference:

[T]he *judicial reluctance* to review the medical staffing decisions of private hospitals, by way of injunction, declaratory judgment or otherwise, reflects the general unwillingness of Courts to substitute their judgment on the merits for the professional judgment of medical and hospital officials with superior qualifications to make such decisions. *Id.* at 65, 756.

The general reluctance to overturn peer review decisions is compounded in the present case. Here, Dr. Wahi calls upon this Court to intervene in *unfinished* peer review proceedings which are being carried out according to CAMC's Bylaws and Medical Staff Procedures. Dr.

Wahi and this Court can only speculate as to what the outcome of the peer review process will be. Therefore, at this point, there cannot be a reasoned and accurate review of whether the procedures afforded Dr. Wahi provided basic procedural fairness, and no determination can be made as to whether CAMC is entitled to the immunities granted to it by the "safe harbor" provisions of HCQIA.[14]

**Equity and Public Policy Dictate That Dr. Wahi
Should be Required to Conclude the Peer Review
Process Underway at CAMC Before Seeking Judicial Relief**

Equity does not allow Dr. Wahi to abandon the established procedures of the medical peer review before the completion of that process, and then file a civil lawsuit to invalidate any peer review findings or actions he finds objectionable. These proceedings are confidential and can, with Dr. Wahi's cooperation, be completed within a reasonable time. Upon completion, he can seek judicial review of the proceedings under *Mahmoodian*, which will include court review of the procedural fairness he was afforded. Any arguments which he may raise regarding procedural fairness *at this time* are completely speculative as the peer review appeal hearing has yet to take place.

If Dr. Wahi is required to go forward with the peer review appeal hearing, he has the right to be represented by counsel, who will undoubtably make a clear record regarding any perceived procedural unfairness. In addition, CAMC is highly motivated by its own self-interest to provide Dr. Wahi with a fair hearing as its immunity from money damages in a subsequent lawsuit is qualified and dependent upon a court determination that the procedures it afforded Dr. Wahi

---

[14] The *Mahmoodian* Court made clear that if the bylaws provide the "basic procedural protections, and if the bylaws' procedures are followed substantially in the particular disciplinary proceeding, a court usually will **not interfere** with the medical peers' recommendation and the hospital's exercise of discretion on the merits." *Id.* (emphasis added). Implicit in this statement is the idea that the courts must allow the proceedings to conclude before an accurate review of the procedures can be undertaken to determine a physician was provided basic procedural fairness.

complied with the HCQIA "safe harbor" guidelines, or were otherwise fair. For all of these reasons, Dr. Wahi will obviously receive a fair hearing.

Likewise, public policy would not be well-served if Dr. Wahi is permitted to seek judicial review and relief during the peer review process. The importance of effective and frank peer review to the public health cannot be overstated. The United States Congress, the Legislature of this State, and the court of almost every jurisdiction have recognized the necessity of allowing the medical profession to effectively police its own members. The HCQIA "safe harbor" guidelines strike an appropriate balance of power between hospitals and physicians undergoing peer review, and CAMC should be entitled to proceed in accordance with those guidelines without having to defend a preemptive lawsuit in federal court.[15] Weak, half-hearted peer review is a violation of the public trust, and is of little value to anyone except the problematic physicians who escape the judgments of their peers. Weak, half-hearted peer review is exactly what the public can expect if physicians being reviewed can drag hospitals into civil court **before the process is even completed.**

Public policy also demands that this Court protect the general public from Dr. Wahi's attempt to escape the reporting requirements mandated by HCQIA by way of a civil lawsuit. The obvious truth is that Dr. Wahi wishes to avoid further peer review by negotiating a favorable resolution to his ongoing privileging woes at CAMC so that he can move into another medical community with a clean record to make a "fresh start", as the words of his own counsel in the Kanawha County action made perfectly clear:

> "Counsel hastens to point out that simply wanting to "get rid" of a doctor who doesn't fit in to a system that has made certain economic and reputational [sic] decisions about what type of

---

[15] CAMC brings to the Courts attention that it was found to have substantially complied with these guidelines by the Honorable James C. Stucky in a recent civil action filed by Dr. Recio, and was granted dismissal in that action on that basis.

patient will be treated is not necessarily reprehensible. If CAMC feels comfortable treating only low risk patients, it is not Plaintiff's counsel's place to gainsay that decision. However, **the correct way to get rid of a highly trained doctor who had been actively recruited by CAMC would be simply to admit that an error in judgment on CAMC's part had occurred and offer the doctor help relocating with, perhaps, a severance package to ease the transition."**

(See *Plaintiff's Combined Motion for a Court-Supervised Hearing at Charleston Area Medical Center and Memorandum in Support Thereof* at Footnote 3). Dr. Wahi clearly wants to move on to another medical community without a record of the peer review actions taken against him in this one. To accomplish this goal, he is apparently willing to tie the hospital up in expensive litigation -- this is the third lawsuit Dr. Wahi has filed against CAMC arising out of his peer review problems -- and wage a scorched-earth attack on the hospital's integrity.

Dr. Wahi is a cardiothoracic surgeon. His stated desire is to continue to operate on the hearts and lungs and major blood vessels of the citizens of this or some other community. Public policy demands that his competence be frankly scrutinized, and that the findings and recommendations of his medical peers be appropriately recorded and reported to the NPDB and the State Medical Board as required by federal law. This Court should not assist him in his efforts to avoid this vitally important process by permitting him to first litigate the complex issues of his medical competence to a lay jury.

### The Primary Jurisdiction Doctrine Should be Applied to Dismiss This Action Because the Relief Sought by Dr. Wahi is Premature

The relief sought by Dr. Wahi is premature as it requires the resolution of predicate issues which can not be properly adjudicated by this Court at this time. The success of Dr. Wahi's lack of "due process"claims, assuming for the sake of argument that they are viable, depend upon whether CAMC is *going to* afford him procedural fairness during the peer review appeal hearing.

Whether the hospital *actually provides* procedural fairness cannot be determined, of course, until the professional review action has been completed. At present there is no record from which it could be determined whether CAMC is entitled to the immunity afforded to hospitals conducting fair peer review by HCQIA. Allowing the administrative peer review process to conclude will result in the development of a full factual record from which a court of competent jurisdiction can review and judge the fairness of the procedures actually used. Allowing the completion of the process will also give CAMC the opportunity to discover and correct their own procedural errors, if any.

### D. CONCLUSION

The doctrine or primary jurisdiction should be applied in the present case to bar Dr. Wahi's civil claims until the peer review proceedings at CAMC are concluded because these proceedings are an essential administrative function delegated to the hospital as part of the well developed regulatory scheme established by the United States Congress when it enacted HCQIA. Allowing Dr. Wahi to proceed with this lawsuit before completing his peer review proceeding would be contrary to the principles underlying the Federal Health Care Quality Improvement Act and the West Virginia Peer Review Statute, and would uproot important and well-settled principles of public policy which recognize that when hospitals are deprived by the courts of the power to effectively self-administrate Medical Staff privileges through standardized peer review, they are necessarily crippled in their ability to provide quality medical care. As a result, the public suffers. This Court should affirm the clear intent of both federal and state law to protect and promote effective peer review by dismissing this action until Dr. Wahi has completed the peer review proceedings at CAMC. In addition, the principles of equity and judicial ripeness favor dismissal.

## II. THE CONSTITUTIONAL CLAIMS IN COUNTS I AND II OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE CAMC IS NOT A STATE ACTOR.

The causes of action for denial of due process in violation of the Fifth and Fourteenth Amendments and for retaliation in violation of the First Amendment right to petition for redress of grievances asserted in Counts I and II of the Complaint should be dismissed because CAMC is a private, non-profit hospital, not a public entity or a state actor. Moreover, CAMC was not engaged in state action in reporting to the NPDB regarding Dr. Wahi.

In Count I of the Complaint, Dr. Wahi alleges that by reporting the suspension of his clinical privileges to the NPDB on December 6, 1996 (1995), refusing to withdraw the erroneous report, filing two other reports dated November 25, 1996 and December 24, 1997, making additional reports on March 22, 1999 and September 13, 1999 and failing to follow its own rules and regulations, as well as those of the NPDB in making these reports, CAMC deprived him of his right to procedural and substantive due process under the Fifth and Fourteen Amendments to the United States Constitution. In Count II, Dr. Wahi alleges that CAMC responded to an April 22, 2003 letter from the NPDB requesting that CAMC describe the reasons for the action taken against Dr. Wahi reported on November (December) 6, 1995 by filing an amended report on June 10, 2003 which contained false information and additional charges. Dr. Wahi also alleges that CAMC responded to an April 24, 2003 letter from the NPDB asking that CAMC describe the reasons for the action taken against Dr. Wahi reported on July 30, 1999 by filing an additional amended report on July 30, 1999 which provided false and impertinent information. Dr. Wahi claims that the amended reports were filed in retaliation for him exercising his First Amendment right to petition the government for redress of grievances. Even assuming all the allegations in the Complaint are true, Dr. Wahi does not state a claim in Counts I and II upon which relief can be granted.

## A. CAMC IS NOT A STATE ACTOR

For Dr. Wahi to recover for alleged violations of the First, Fifth or Fourteenth Amendments, he must first establish that CAMC is a state actor or that its conduct at issue here constitutes state action. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.E.2d 482 (1972) (Fourteenth Amendment can be violated only by conduct that may be characterized as state action); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.E.2d 449 (1974) (due process clause offers no shield against private conduct, however discriminatory or wrongful). *See also Modaber v. Culpeper Memorial Hospital, Inc.*, 674 F.2d 1023 (4th Cir., 1982); *Carter v. Norfolk Community Hospital Association, Inc.*, 761 F.2d 970 (4th Cir. 1985). Dr. Wahi is barred by collateral estoppel from asserting that CAMC is a state actor in the present case because the same issue was decided in a prior case he filed against CAMC in the Circuit Court of Kanawha County. *See Arnold Agency v. West Virginia Lottery Commission*, 206 W.Va. 583, 526 S.E.2d 814 (1999) (collateral estoppel, or issue preclusion, will bar a claim if the issue previously decided is identical to the one presented in the action in question, there is a final adjudication on the merits in the prior action, the party against whom the doctrine is invoked was a party or in privity with a party to a prior action and the party to whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action).

Dr. Wahi filed an action against CAMC in the Circuit Court of Kanawha County on November 27, 2000, being Civil Action No. 00-C-3043, requesting court intervention in the ongoing peer review proceedings relating to the suspension of his Medical Staff privileges. In support of his argument that CAMC is a state actor that must adhere to federal and state constitutional requirements, Dr. Wahi contended that CAMC is required to report any actions taken by it adversely affecting his privileges to the West Virginia Board of Medicine and the National Practitioners Data Bank. In a Memorandum Opinion and Order dated December 6, 2001,

the Court found that CAMC is a private, nonprofit hospital incorporated under the laws of the

State of West Virginia; CAMC was created voluntarily by private individuals and is operated by

an elected Board of Trustees; and CAMC is not owned or operated by any governmental entity.

The Court concluded that a private hospital is not a "state actor" so as to invoke federal and state

due process requirements when it decides to revoke or otherwise affect medical staff privileges.

In reaching this conclusion, the Court noted that the West Virginia Supreme Court has rejected

similar public entity arguments.[16] See, the Memorandum Opinion and Order is attached hereto

as Exhibit "A." Because Dr. Wahi has already litigated the issue of whether CAMC is a state

actor on the basis that the hospital is required to report any actions adversely affecting privileges

to the West Virginia Board of Medicine and the NPDB, he is barred from making the same

argument in this case.

Cases the Circuit Court of Kanawha County did not cite in ruling on this issue in its

Memorandum Opinion and Order which are also compelling, if not controlling, in the present case

include *Thompson v. Charleston Area Medical Center, Inc.*, 539 F.Supp. 671 (S.D.W.Va. 1982)

and *Mahmoodian v. United Hospital Center*, 185 W.Va. 59, 404 S.E.2d 750 (1991). In *Thompson*,

a former teaching nurse at the CAMC school of anesthesia brought an action against the hospital

---

[16]*See State ex rel. Sams v. Ohio Valley General Hospital Association*, 149 W.Va. 229,
140 S.E.2d 457 (1965) (hospital created by voluntary agreement of private individuals and
managed and governed by those selected by such individuals was a private hospital,
notwithstanding that it was affected with a public interest, was granted charitable immunity,
was exempt from payment of real and personal property taxes and was recipient of federal
funds under Hill-Burton Act); *Queen v. West Virginia University Hospitals, Inc.*, 179 W.Va.
95, 365 S.E.2d 375 (1987); *Orteza v. Monongalia County General Hospital*, 173 W.Va. 461,
318 S.E.2d 40 (1984) (trend in state action decisions seems to be away from finding state
action in cases involving personnel at quasi-public institutions). *See also Modaber v.
Culpeper Memorial Hospital, Inc.*, 674 F.2d 1023 (4th Cir. 1982) (withdrawal of physician's
clinical staff privileges at private nonprofit hospital, which received Hill-Burton Act funds,
accepted medicare and medicaid patients and reported revocation of privileges to state
medical licensing authorities did not constitute state action for purposes of Fourteenth
Amendment).

alleging that her dismissal was without due process of law. The plaintiff relied heavily upon the relationship between West Virginia University and CAMC in support of her contention that the hospital is a state actor. Applying the standards articulated by the Fourth Circuit in *Modaber*, the District Court found that although CAMC had various connections to local, state and federal government, the decision to discharge the nurse was not at the behest of the state, and the hospital did not act in an exclusively state capacity or for the direct benefit of the state. Accordingly, the dismissal of the nurse did not constitute state action for the purpose of 42 U.S.C. § 1983. 539 F.Supp. at 678.

In *Mahmoodian*, an obstetrician brought a civil action for injunction against a private hospital's revocation of his medical staff appointment privileges. The physician contended that UHC was a state actor which must adhere to federal and state constitutional due process requirements when deciding to revoke or otherwise adversely affect medical staff appointment privileges. He argued that UHC serves a public interest in community health, receives funds from governmental sources and is subject to governmental regulation. The West Virginia Supreme Court held that the UHC is not a state actor so as to invoke federal and state constitutional due process requirements since the hospital was voluntarily created by private individuals, was operated by an elected board of directors and was not owned or operated by any governmental entity. 185 W.Va. at 61, 404 S.E.2d at 752. Thus, even if collateral estoppel does not apply to the issue, it is clear from the law in West Virginia and the Fourth Circuit that CAMC is not a state actor for the purpose of the constitutional claims asserted by Dr. Wahi in the present case.

B. CAMC WAS NOT ENGAGED IN STATE ACTION IN REPORTING TO THE NPDB

Dr. Wahi alleges in Counts I and II of the Complaint that CAMC was acting "under color of federal law." CAMC acknowledges that the conduct of a private non-profit hospital, which is

not generally a state actor, may constitute state action for the purpose of a due process claim. However, Dr. Wahi cannot establish that CAMC was engaged in state action by reporting to the NPDB regarding the suspension of his privileges or in filing amended reports at the request of the NPDB.[17]

The Fourth Circuit in *Modaber* stated that to determine whether or not the defendant hospital's conduct was a state action, it must inquire "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity that the action of the latter may fairly be treated as that of the State itself." 674 F.3d at 1025 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)). A state becomes responsible for a private party's act if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest. 674 F.3d at 1025. The private party acts in an exclusively state capacity when it "exercises powers traditionally exclusively reserved to the state." 674 F.3d at 1025 (quoting *Jackson*, 419 U.S. at 352, 95 S.Ct. at 454). The private party acts for the direct benefit of the state when it shares the rewards and responsibilities of a private venture with the state. 674 F.3d at 1025 (citing *Jackson*, 419 U.S. at 357-58, 95 S.Ct. at 456-57, *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 723-24, 81 S.Ct. 856, 860-61, 6 L.Ed.2d 45 (1961)). The private party acts at the specific behest of the state when it does a particular act which the state has directed or encouraged. 674 F.3d at 1025 (citing *Jackson*, 419 U.S. at 354, 357, 95 S.Ct. at 455, 456).

---

[17] Although Dr. Wahi alleges in Counts I and II that CAMC was acting "under color of federal law," the requirement of action "under color of state law" establishes a right to recover under 42 U.S.C. § 1983. The proper analysis in the present case is whether Dr. Wahi has met the requirement of "state action" to establish a violation of the Fourteenth Amendment. While conduct satisfying the state action requirement of the Fourteenth Amendment satisfies the statutory requirement of action under color of state law, it does not follow that all conduct that satisfies the under color of state law requirement would satisfy the Fourteenth Amendment requirement of state action. *Lugar*. 457 U.S. at 935, 102 S.Ct. at 2752.

Applying this test to the plaintiff's contentions, the Court in *Modaber* held that receiving Hill-Burton Act funds or accepting patients receiving medicare and medicaid benefits did not make the hospital's actions attributable to the state. Importantly, the Court also held that the fact the hospital was required by Virginia statute to report the withdrawal of the physician's clinical staff privileges to medical licensing authorities did not make the hospital's actions attributable to the state. The Court stated that the state statutes do not authorize state officials to make privilege decisions or to set forth directions governing the outcome of such decisions or attach consequences to their results. The statutes simply require that revocations be reported, and confer immunity from civil liability upon persons making the report. The mere duty to report the revocation of privilege does not involve the "exercise by a private entity of powers traditionally reserved to the State." 674 F.2d at 1027 (citing *Jackson*, 419 U.S. at 352, 355-57, 95 S.Ct. 454, 455-56). The Court further noted:

> Making it state action merely because it is reported to a medical licensing authority would be just as nonsensical as making a private employer's decision to fire a parolee state action because it is reported to the parole commission. In each case, the reasons for making the decision may be totally independent of the state's reason for wanting the information.

674 F.2d at 1027, n. 17.[18]

The decision from the Fourth Circuit in *Modaber* is directly on point with the present case. The fact that CAMC reported the suspension of Dr. Wahi's privileges to the NPDB or filed subsequent reports at the request of the NPDB does not make the hospital's actions attributable

---

[18]*See also Carter v. Norfolk Community Hospital Assoc., Inc.*, 761 F.2d 970 (4th Cir. 1985) (hospital's termination of physician's professional privileges did not involve state action where state was involved only to point of encouraging hospital to comply with its regulations controlling abuses in medicare and medicaid programs) *Freilich v. Board of Directors of Upper Chesapeake Health, Inc.*, 142 F.Supp.2d 679 (D.Md. 2001) (Fourteenth Amendment did not apply to actions of private hospital in terminating physician's hospital privileges because regulatory scheme left the challenged decision to the judgment of each individual hospital, so that actions of hospital defendants were not fairly attributable to the state).

to the state. Because there is no state action, Dr. Wahi cannot state a claim based upon violations

of his rights under the First, Fifth or Fourteenth Amendments. Accordingly, the claims in Counts

I and II of the Complaint fail as a matter of law.

   **WHEREFORE,** Charleston Area Medical Center, Inc., respectfully requests that this

Court enter an Order granting this motion to dismiss or for summary judgment and requiring Dr.

Wahi to exhaust his administrative remedies with respect to his peer review proceedings at CAMC

prior to pursuing a civil lawsuit premised upon any actions taken against him as a part of, or as

a result of, that administrative peer review process. In the alternative, CAMC respectfully moves

the Court for the entry of an Order dismissing the constitutional claims found in Counts I & II of

the Complaint on the grounds that CAMC is not a state actor, was not engaged in state action in

reporting to the NPDB, and, therefore, these counts fail to state viable claims as a matter of law.

CAMC further requests such additional relief as the Court deems fair and just under all of the

circumstances, including attorneys fees and costs incurred as permitted by law.

                              CHARLESTON AREA MEDICAL CENTER, INC.
                              By Counsel

Richard D. Jones (WV State Bar No. 1927)
David S. Givens (WV State Bar No. 6319)
Erica Baumgras (WV State Bar No. 8590)
P.O. Box 3843
Charleston, WV 25338-3843

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

RAKESH WAHI, M.D.,

       Plaintiff,

v.

CHARLESTON AREA MEDICAL
CENTER, INC., a West Virginia
corporation, and other Entities and
Individuals now unknown,

       Defendant.

CIVIL ACTION NO. 00-C-3043
(Judge King)

## MEMORANDUM OPINION AND ORDER

### FINDINGS OF FACT

1.    CAMC is a private, nonprofit hospital incorporated under the laws of the State of West Virginia. It was created voluntarily by private individuals. It is operated by an elected Board of Trustees and is not owned or operated by any governmental entity.

2.    On December 16, 1992, Dr. Wahi was appointed to the Medical Staff of CAMC, Associate (Provisional) Staff Category, with assignment to the Department of Cardiovascular Medicine, Section of Thoracic Surgery. As a cardiothoracic surgeon, Dr. Wahi was initially granted privileges to perform complex surgical procedures involving major blood vessels, the lungs, and the heart (including coronary artery bypass grafting, commonly referred to as "open heart" or "heart bypass" surgery).

3.    Since Dr. Wahi's initial appointment to the medical staff, CAMC has received numerous verbal complaints, written complaints, incident reports, and statements of concern (referred to collectively hereinafter as "statements of concern") alleging unprofessional and unethical conduct by Dr. Wahi and calling into question Dr. Wahi's surgical competence, professional judgment, ability to



practice cooperatively with the other healthcare professionals caring for his patients, and willingness to abide by certain restrictions which had been placed upon his medical staff privileges beginning in 1995. These statements of concern arise out of dozens of separate incidents, and originate from multiple healthcare professionals in various departments of the hospital, as well as from the family members of his patients.

    4.    After more than four years of peer review monitoring and the application and enforcement of almost continuous privilege restrictions, CAMC summarily suspended all of Dr. Wahi's medical staff privileges in July of 1999.

    5.    Under CAMC's Bylaws and Article III of its Medical Staff Procedures Manual, Dr. Wahi is afforded the right to challenge his summary suspension, and the subsequent denial of his Application for Medical Staff Reappointment, by requesting a formal peer review hearing. Dr. Wahi has indicated his intent to exercise this right, in writing. Dr. Wahi and CAMC have not yet agreed to a hearing date.

    6.    On November 27, 2000, Dr. Wahi filed a Complaint in the Circuit Court of Kanawha County requesting court intervention in the ongoing peer review proceedings relating to the suspension of his medical staff privileges. On January 17, 2001, Dr. Wahi filed motions for extraordinary relief. In his Complaint and motions for extraordinary relief, Dr. Wahi claims that he will be denied a fair peer review hearing as a matter of law if the members of the hearing panel and the presiding hearing officer are selected as provided for by Section 3.8 of Article III of CAMC's Medical Staff Procedures Manual. He contends that it is manifestly unfair for CAMC to seek to

2

suspend his privileges, and then to appoint the hearing officer who will preside over his hearing[1] and

the members of the hearing panel[2] who will decide whether or not to reinstate his privileges at

CAMC.[3]

    7.    Dr. Wahi contends that *Mahmoodian v. United Hosp Center*, 185 W. Va. 59, 404 S.E.2d

750 (1991), does not preclude this Court from granting his requested relief prior to commencement

of the administrative hearing. Dr. Wahi contends that the exercise of jurisdiction for that purpose by

the Court is consistent with *Mahmoodian*, insofar as it relates to fair procedures and the designation

of an impartial tribunal. Finally, Dr. Wahi contends that if the requested prehearing relief is not

granted, CAMC will be able to foreclose later meaningful judicial review of any adverse decision

against him based upon the limited standards of review under *Mahmoodian*.

---

[1] CAMC designated F. C. Gall, an attorney employed by CAMC, as the presiding officer. (*See* Letter of Philip H. Goodwin, 12/2/99, Exhibit 3 to the Complaint.) There is an indication that Mr. Gall has stated that the plaintiff will never work at CAMC again, (*see* Letter of Richard M. Neely, 10/23/00, Exhibit 6 to the Complaint), and the plaintiff has indicated that he may wish to call Mr. Gall as a witness. (*See* Letter of George G. Guthrie, 9/22/00, Exhibit 4 to the Complaint.) Initially, CAMC refused to withdraw its designation of Mr. Gall as the presiding officer. (*See* Letter of Cheryl A. Eifert, 10/11/00, Exhibit 5 to the Complaint and Letter of Chris Gall, 10/31/00, Exhibit 7 to the Complaint.) At the hearing on this matter, CAMC indicated that it would replace Mr. Gall as the presiding officer.

[2] The petitioner alleges that all members of the hearing panel rely on CAMC for their livelihood, to some degree, and that one of the physicians named to the hearing panel "has been involved in a previous professional dispute with Dr. Wahi." (*See* Complaint, ¶ 27.) He has not identified the member the panel with whom he had a dispute, or the nature of the dispute.

[3] In accordance with the reasoning and conclusions of law set forth in this Opinion Order, the court does not consider at this time the plaintiff's motion for immediate reinstatement of his full medical staff privileges, plaintiff's motion for an order compelling CAMC to withdraw reports adverse to him that were previously submitted to the West Virginia Board of Medicine or the National Practitioner Data Bank, or his motion to exclude evidence.

8.     CAMC contends that the standard of limited judicial review sanctioned by *Mahmoodian* limits the role of this Court in this case to a post-hearing review to determine whether the procedures afforded Dr. Wahi were fair.  CAMC further observes that it is required to provide Dr. Wahi with a "fair hearing" under the provisions of various federal and West Virginia statutes, including the Health Care Quality Improvement Act of 1986, 42 U.S.C.A. §§ 1101-11152 ("Act"), and the West Virginia Peer Review Statute, W. Va. Code § 30-3-C-1, *et seq.*  While CAMC agrees that this Court has jurisdiction of this action, it argues that for policy reasons, this Court should decline to intervene in this action until after the administrative hearing requested by Dr. Wahi and any appeals resulting therefrom are concluded.

9.     Section 3.8 of Article III provides:

> Hearing Panel.  When a hearing is requested, the President of CAMC, acting for the Board and after considering the recommendations of the Chief of Staff and the Chairman of the Board, shall appoint a panel of not less than three members, none of whom are in direct competition with the individual who requested the hearing ("Hearing Panel").  The majority of the panel shall be composed of persons who shall not have actively participated in the consideration of the matter involved at any previous level and may include Physicians not connected with the Hospital if such Physicians are not in direct competition with the person who requested the hearing.  Such appointment shall include designation of a chairman of the Hearing Panel.  Knowledge of the matter involved shall not preclude any individual from serving as a member of the Hearing Panel.

10.    Dr. Wahi has expressly agreed, in writing, to be bound by CAMC's medical staff governing documents, including Section 3.8 of Article III of the CAMC Medical Staff Procedures Manual.

11.    Dr. Wahi now asserts that the fact that Section 3.8 of Article III provides that CAMC's President shall appoint the peer review hearing panel and the hearing officer denies him a fair hearing,

4

*/*

*ipso facto*, and argues that this Court should, therefore, assert jurisdiction over his hearing, invalidate the panel selection procedure set forth in Section 3.8, and require that "CAMC pick a member of the panel, [he] pick a member of the panel, and the two members so picked select the third member of the panel." Dr. Wahi also asks the Court to order the parties to "meet and agree upon an impartial presiding officer, and that if counsel cannot agree, that [the Court] name the presiding officer." *See Plaintiff's Combined Motion for a Court-Supervised Hearing at Charleston Area Medical Center and Memorandum in Support Thereof*, at pp. 8-9.

## CONCLUSIONS OF LAW

1.  A private hospital is not a "state actor," so as to invoke federal and state constitutional due process requirements when it decides to revoke medical staff appointment privileges.[4]

2.  Decisions of <u>public</u> hospitals adversely affecting privileges of medical staff members must be reached after affording "due process," while such decisions by <u>private</u> hospitals must be reached only after affording "fair procedures." The fair procedures to be accorded a physician in a disciplinary proceeding that could seriously affect his or her ability to practice medicine include notice of the charges and a fair hearing before an impartial tribunal. *Mahmoodian*, at 65, 404 S.E.2d at 756.

---

[4] Dr. Wahi contends that CAMC is a "state actor" that must adhere to federal and state constitutional "due process" requirements when deciding to revoke or otherwise affect adversely his medical staff appointment privileges. In support of this contention, Dr. Wahi argues that CAMC is required to report any actions taken by it adversely affecting his medical staff privileges to the West Virginia Board of Medicine and the National Practioners Data Bank (a federally mandated national database collecting and disseminating various information regarding physicians). The West Virginia Supreme Court has rejected similar public entity arguments. *See State ex rel. Sams v. Ohio Valley General Hospital Association*, 149 W. Va. 229, 140 S.E.2d 457 (1965) (syl. pts. 2-3 and 149 W. Va. at 434-37, 140 S.E.2d at 40-62). *See also Queen v. West Virginia University Hospitals, Inc.*, 179 W. Va. 95, 103-105, 365 S.E.2d 375, 383-85 (1987) (public hospital; *Sams* distinguished); *Orteza v. Monongalia County General Hospital*, 173 W. Va. 461, 464-466, 318 S.E.2d 40, 43-45 (1984). *See also Modaber v. Culpepper Memorial Hospital, Inc.*, 674 Fd.2d 1023, 1025-26 (4th Cir. 1982).

3.    "A hospital has the right, indeed the duty, to ensure that those persons who are appointed to its medical staff meet certain standards of professional competence and professional conduct, so long as there is a reasonable nexus between those standards and the hospital's mission of providing overall quality patient care." *Id.* at 68, 404 S.E.2d 759.

4.    "The decision of a private hospital to revoke, suspend, restrict or to refuse to renew the staff appointment or clinical privileges of a medical staff member is subject to limited judicial review to ensure that there was a substantial compliance with the hospital's medical staff bylaws governing such a decision, as well as to ensure that the medical staff bylaws afford basic notice and fair hearing procedures, including an impartial tribunal." Syl. pt. 1, *Mahmoodian, supra.*

5.    The "judicial reluctance to review the medical staffing decisions of private hospitals, by way of injunction, declaratory judgment or otherwise, reflects the general unwillingness of the courts to substitute their judgment on the merits for the professional judgment of medical and hospital officials with superior qualifications to make such decisions." *Mahmoodian* at 65, 404 S.E.2d 756.

6.    Public policy encourages healthcare professionals to monitor the competency and professional conduct of their peers in order to safeguard and improve the quality of patient care. *Id. See also* W. Va. Code §30-3C-1 to 30-3C-3, as amended; 42 U.S.C. §§ 11101-11152, as amended.

7.    While peer review confidentiality and immunity statutes do not expressly foreclose judicial review or proceedings seeking injunctive or declaratory relief, "it is evident that the intent of these statutes was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of healthcare professionals and of governing bodies of hospitals in an area within their expertise." *Mahmoodian* at 65, 404 S.E.2d 756. *See also Patrick v. Burget,* 486 U.S. 94, 104-5, 108 S. Ct. 1658, 1665, 100 L.Ed.2d 83, 94 (1988). "The legislative intent for

6

medical staffing decisions is to defer generally to the judgment and discretion of the healthcare peers

and hospital governing authorities." *Id.* at 66, 404 S.E.2d at 757.

> 8. [T]here is no statute in this state expressly providing for appellate review by the courts of health care peer review decisions. This fact suggests a legislative intent that there be a limited scope of judicial review in proceedings invoking, for example, the extraordinary jurisdiction of courts to award injunctions. 'In so specialized and sensitive an activity as governing a hospital, courts are well advised to defer to those with the duty to govern." *Nanavati v. Burdette Tomlin Memorial Hospital*, 107 N.J. 240, 251, 526 A.2d 697, 702-03 (1987). Underlying the limited scope of judicial review of health care peer review decisions is an awareness that courts should allow hospitals, as long as they proceed fairly, to run their own business. That awareness is tempered by the recognition that physicians need hospital medical staff appointment privileges and clinical privileges to serve their patients; therefore, hospitals must treat physicians fairly in making decisions about those privileges. *Id.* at 249-50, 526 A.2d at 702.

*Mahmoodian* at 66, 404 S.E.2d at 757.

9. Where an administrative body and a circuit court have concurrent jurisdiction of an issue

requiring special expertise extending beyond the conventional experience of judges, the doctrine of

primary jurisdiction applies, and the Court should refrain from exercising jurisdiction until after the

administrative body has resolved any pending issues. *See* Syl. pt. 1, *State ex rel. Bell Atlantic-West

Virginia v. Ranson* 201 W. Va. 402, 497 S.E.2d 755 (1997). The doctrine of primary jurisdiction

applies where a claim is originally cognizable in the courts, and comes into play whenever

enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have

been placed within the special competence of an administrative body." *Id.* at 410-11, 497 S.E.2d at

763-4.

10. Primary jurisdiction applies when judicial determination of an issue demands the exercise

of administrative discretion requiring the special knowledge and experience of the administrative

tribunal <u>or</u> where court action will possibly interfere with or impair the coherence and uniformity of

7

an intricate administrative program. The primary jurisdiction doctrine is not technically a question of jurisdiction, but rather a matter of judicial restraint. *Id.* at 410-11, 497 S.E.2d at 763-4 (quoting 73 C.J.S. Public Administrative Law and Procedures § 37 at 437.) "Moreover, because there is no 'fixed formula' to determine whether the primary jurisdiction doctrine should be applied, 'each case must be examined individually to determine whether it would be aided by the doctrine's application.'" *Id.* (quoting *Penny v. South Western Bell Telephone Co.*, 906 F.2d 183, 187 (5th Cir. 1990)).

11. At least two federal courts have applied the doctrine of primary jurisdiction to dismiss or stay suits brought by physicians engaged in ongoing professional peer review proceedings. *See Johnson v. Nyack Hospital*, 964 F.2d 116 (2nd Cir. 1992); and *Rogers v. Columbia/HCA*, 961 F. Supp. 960 (W.D. La. 1997). Several state courts have applied the doctrine of exhaustion of administrative remedies to suits brought in apparent circumvention of a hospital peer review process. *See Huntsville Memorial Hosp. v. Ernst*, 763 S.W.2d 856 (Tex.Ct.App. 14th Dist. 1988); *Eidelson v. Archer*, 645 P.2d 171 (Alaska 1982); and *Garrow v. Elizabeth General Hosp. and Dispensary*, 79 N.J. 549, 401 A.2d 533 (1979).

12. The enactment of the federal Healthcare Quality Improvement Act of 1986 (42 U.S.C. §§ 11101-11152, as amended) ("HCQIA") has encouraged hospitals to use standardized peer review hearing procedures. The Act establishes standardized procedures for hospital peer review proceedings and affords certain immunities to hospitals and physicians who, in good faith, participate in the medical peer review process using the procedural guidelines outlined in the Act, or other procedures fair to the physician being evaluated.[5] Since the enactment of HCQIA, the peer review

---

[5] Published Law No. 99-660 title IV, §402, 100 Stat. 3784 (current version at 42 U.S.C.A. §§ 11101-11152 (W pamphlet 1991). See specifically, 42 U.S.C.A. §§ 1111-12.

procedures contained in the Act have become the national standard for hospitals conducting peer review. *See* Colantonio: *Healthcare Quality Improvement Act of 1986 and its Impact on Hospital Law*, 91 W. Va. L. Rev. 91 (1988); *Mahmoodian* at n. 10.

13.     For a hospital conducting peer review to qualify for immunity under the HCQIA, the peer review action must be taken "(1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the involved physician or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3)." § 11112.

14.     Federal law provides that adequate "notice" requires a description of the proposed action, the reasons for the proposed action, and disclosure of the hearing rights to which the physician is entitled. § 11112(b)(1). The "hearing" to which the physician is entitled is trial-type in nature. The physician has a right to represented by an attorney, and to have a record made of the hearing. § 11112(b)(3)(C)(ii). The physician may call witnesses and cross-examine the hospital's witnesses, and is granted the opportunity to present evidence and to "submit a written statement at the end of the hearing." § 11112(b)(3)(C)(iv)-(v). The Act specifies that the hearing should be held either (1) before an arbitrator "mutually acceptable to the physician and the health care entity," (2) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician," or (3) "before a panel of individuals who are appointed by the entity and are not an direct economic competition with the physician involved . . . ." § 11112(b)(3)(A)(i)-(ii).

9

15.    Section 3.8 of Article III of CAMC's Medical Staff Procedures Manual complies with the third option set forth in § 11112 of HCQIA for selection of a peer review hearing panel and, therefore, constitutes a fair panel selection procedure in the eyes of federal law. In addition, this panel selection procedure violates no state laws. This court concludes that Section 3.8 of Article III of CAMC's Medical Staff Procedures Manual, on its face, satisfies the basic fair hearing requirements articulated in *Mahmoodian*.

16.    In *Mahmoodian*, the Court held that the hospital satisfied the requirement of fair procedures by providing a hearing presided over by "an impartial local attorney," and a hearing panel consisting of "three medical staff members who were not obstetrician/gynecologists and who had not participated in the investigative process." *Mahmoodian* at 62, 404 S.E.2d at 753. In *Mahmoodian*, it appears that the hearing officer and the hearing panel were selected by the hospital.

17.    In light of the decision in *Mahmoodian*, the Court cannot hold that Dr. Wahi will not receive a fair hearing solely because CAMC's bylaws give it the right to select the hearing panel members and the hearing officer. Dr. Wahi's argument, that the selection of the hearing panel members pursuant to CAMC's bylaws will deny him a fair hearing, is speculative. The Court can only determine whether the plaintiff has been denied a fair hearing upon a review of the record developed before the hearing panel.

18.    As noted above, Dr. Wahi has alleged that he and one of the members of the hearing panel, who he has not identified, have been involved in a professional dispute. It appears that Dr. Wahi believes that this member of the hearing panel is biased against him because of this dispute.

19.    If Dr. Wahi believes that the hearing officer or one or more members of the hearing panel are not impartial, he may raise that issue before the hearing panel. The determination of whether or

10

not a member of the hearing panel is biased is an issue that must be decided, in the first instance, by the hearing panel. Logic and fairness would seem to dictate that the matter should be resolved prior to any hearing on the substantive issues respecting Dr. Wahi's suspension. If the issue is not resolved to his satisfaction, he may then raise the issue on review.

20.    Dr. Wahi has also raised the issue of the adequacy of the notice he received with respect to the issues to be heard by the hearing panel. He contends that CAMC has not set forth the charges upon which his staff privileges have been suspended with enough specificity to allow him to adequately prepare a defense. Specifically, he contends that the notice he received suspending his staff privileges was vague, in that it did not identify the specific incidents upon which CAMC relied in suspending his staff privileges.

21.    As noted previously, fair procedures require that Dr. Wahi have notice of the charges upon which the suspension of his staff privileges is based. *Mahmoodian* at 65, 404 S.E.2d at 756. *Mahmoodian* indicates that a hospital's failure to give notice to a doctor violates his common law, contractual right to fair procedures in proceedings involving the suspension of hospital medical staff privileges.

22.    It would be premature for the Court to make any determination as to whether or not the notice given to Dr. Wahi satisfies the "fair procedures" requirement, since the Court has not reason to believe that the hearing panel will not abide by principles of fairness and consider only those charges specified in the notice. This Court can only determine whether or not the hearing panel considered evidence respecting issues not set forth in the notice upon review of the record of the hearing, giving due consideration to the notice, the enumeration of the charges and the evidence presented against Dr. Wahi in support of the charges. If, after the hearing, the plaintiff believes the

11

panel considered charges not specified in the notice, that is a matter which he may ask the Court to review.

23. Principles of due process require a licensing agency to afford notice to an individual when it seeks to revoke the licensee's license to engage in the activity licensed. In West Virginia, notice must set forth with particularity the reasons the Board of Medicine seeks to revoke the physician's license. W. Va. Code § 33-3-14(h)

24. As noted previously, CAMC is not required to provide due process as a part of its proceedings to suspend Dr. Wahi's medical staff privileges because it is a private hospital. *Mahmoodian* at 65, 404 S.E.2d at 756.

25. However, if CAMC chooses to adhere to due process principles in its notice, including identifying each and every incident upon which it intends to rely in suspending Dr. Wahi's medical staff privileges, sufficient to allow him to adequately prepare a defense to the charges, it should, at a minimum, satisfy the requirement of fair procedures, which is a less stringent standard than the due process standard.

26. Dr. Wahi contends that the Court should require CAMC to limit its consideration to evidence related to matters it relied on in summarily suspending his medical staff privileges in July and August of 1999.

27. Except as referred to by the parties in their pleadings and motions, and the documents appended thereto, the Court is not advised as to all of the rules and procedures applicable to a hearing involving the suspension of medical staff privileges at CAMC. Consequently, the Court cannot determine in advance whether the evidence that Dr. Wahi contends is impermissible will, in fact, be considered by the hearing panel. There mere fact that CAMC advances certain theories in support

12

of its attempt to suspend Dr. Wahi's privileges, this does not mean that those theories, or evidence in support thereof, will be admitted or considered by the hearing panel.

28.    In addition, even if the Court knew what evidence was to be introduced and admitted before the hearing panel, it should not decide those issues in advance of the hearing panel.

29.    Even if Dr. Wahi is correct in contending that fair procedures dictate that CAMC must limit its consideration to evidence related to matters it relied on in summarily suspending his medical staff privileges in July and August of 1999, the Court cannot assume that CAMC will not abide by such fair procedures.

30.    The Court does not intend to render advisory opinions respecting the admissibility of evidence in advance of the hearing, based on the mere assertion that CAMC might produce and the hearing panel might consider improper evidence.

31.    The Court does not intend to make any advance determination of what evidence may or may not be introduced at the evidentiary hearing, nor does it intend to engage in an interlocutory or piecemeal review the hearing panel's evidentiary rulings.

32.    If Dr. Wahi is correct in his assertions that the procedures that CAMC intends to utilize do, in fact, fall short of the requirements fair procedures, the Court must defer to CAMC and give it every opportunity to avoid or correct such procedural defects prior to and during the course of the hearing.

33.    Federal law, state law, and public policy all demand that hospital peer review procedures not be subject to challenge and review in circuit court while the peer review proceedings are still underway where: (1) the procedures complained of comport with federal and state law, (2) the

13

38.    Consistent with the provisions of W. Va. Code § 30-3C-1, *et seq.*, the Court is of the opinion that CAMC is correct that peer review information is to remain confidential. However, this Order effectively terminates this action. Therefore, the issue raised by CAMC is moot. If CAMC is concerned about the disclosure of peer review documents before the hearing panel, it should raise the issue before the hearing panel and the hearing officer.

39.    The Court, deeming it unnecessary to do so, will not seal the record in this action.

40.    On or about February 20, 2001, CAMC filed "Defendant's Response to Plaintiff's Motion to Limit Scope of Administrative Hearing." Because CAMC had previously filed a motion to seal the record in this action, the motion was filed with the undersigned rather than with the Clerk.

41.    The record in this action not being sealed, the Court will file "Defendant's Response to Plaintiff's Motion to Limit Scope of Administrative Hearing" with the Clerk, and will deem it to have been filed as of February 20, 2001, the date it was filed with the undersigned and served on opposing counsel.

Accordingly, the Court does HEREBY ORDER that the plaintiff's motion for extraordinary relief, wherein he requests the Court to provide certain oversight respecting the hearing to be conducted by the CAMC hearing panel, is denied. The Court does FURTHER ORDER that the defendant's motion for a protective order and to seal the record is denied. The Court does FURTHER ORDER that "Defendant's Response to Plaintiff's Motion to Limit Scope of Administrative Hearing" is to be filed by the Clerk, and that it shall be deemed filed as of February 20, 2001. The Court does FURTHER ORDER that this civil action is HEREBY DISMISSED from the active docket of this Court.

15

The exceptions and objections of the parties, to the extent that they are adversely affected by this Order, are noted and preserved.

The Clerk is directed to mail a copy of this Order to all counsel of record.

ENTER this 6TH day of _____Dec._____, 2001.

_____
CHARLES E. KING, JR., Circuit Judge
Thirteenth Judicial Circuit

16

RECEIVED JUL 2 2 2002

STATE OF WEST VIRGINIA

IN THE SUPREME COURT OF APPEALS

IN VACATION

Rakesh Wahi, M. D., Plaintiff
Below, Petitioner

vs.) No. 020735

Charleston Area Medical Center, Inc.,
a West Virginia corporation, and other
entities and individuals now unknown,
Defendants Below, Respondents

On a former day, to-wit, April 5, 2002, came the petitioner,

Rakesh Wahi, M. D., pro se, and presented to the Court his petition praying for an

appeal from a judgment of the Circuit Court of Kanawha County, rendered on the 7th

day of December, 2001, with the record accompanying the petition. Thereafter, on the

2nd day of May, 2002, came the respondent, Charleston Area Medical Center, Inc., a

West Virginia corporation, by Flaherty, Sensabaugh & Bonasso, and Richard D.

Jones, its attorneys, and presented to the Court its written response in opposition

thereto.

Upon consideration whereof, the Court is of opinion to and doth

hereby refuse said petition for appeal. Justice Starcher would grant.

DONE IN VACATION of the Supreme Court of Appeals, this 15th

day of July, 2002.

Honorable Robin Jean Davis, Chief Justice

Honorable Larry V. Starcher

Honorable Elliot E. Maynard

Honorable Warren R. McGraw



Honorable Joseph P. Albright

Received the foregoing order this 15th day of July, 2001, and

entered the same in Order Book No. 146.

A True Copy

Attest: _____

Clerk, Supreme Court of Appeals

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

RAKESH WAHI, M.D.,

       Plaintiff,

V.                                Civil Action No. 2:04-0019
                                 (Judge Goodwin)

CHARLESTON AREA MEDICAL CENTER,
a West Virginia Corporation, and
JANE DOES I - X,

       Defendants.

## CERTIFICATE OF SERVICE

     I, David S. Givens, counsel for Charleston Area Medical Center, Inc., do hereby certify that

I have served the foregoing *Defendant's Motion to Dismiss or For Summary Judgment,*

*Defendant's Motion for Leave to File Memorandum of Law in Excess of Twenty Pages* and

*Defendant's Memorandum of Law in Support of its Motion to Dismiss or For Summary*

*Judgment* upon John C. Yoder, Esq., counsel for plaintiff, this 6th day of February, 2004, by

depositing true copies in the United States mail, postage prepaid, addressed to him at P. O. Box 940,

Harpers Ferry, West Virginia 25425.

                                         David S. Givens (WV Bar No. 6319)

FLAHERTY, SENSABAUGH & BONASSO, PLLC
P.O. Box 3483
Charleston, WV 25338-3843